UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WAYNE SEALS,

        Petitioner,                 Case No. 2:17-cv-13757
                                      Hon. George Caram Steeh

   v.

WILLIS CHAPMAN,

        Respondent.
_____/

## OPINION AND ORDER (1) GRANTING PETITION FOR WRIT OF HABEAS CORPUS ON PETITIONER'S THIRD CLAIM, (2) DENYING PETITION FOR WRIT OF HABEAS CORPUS ON PETITIONER'S FIRST AND SECOND CLAIMS, AND (3) GRANTING CERTIFICATE OF APPEALABILITY ON PETITIONER'S FIRST CLAIM

Wayne Seals ("Petitioner") filed this habeas case under 28 U.S.C. §

2254. Petitioner was convicted after a bench trial in the Wayne Circuit

Court of second-degree murder, assault with intent to do great bodily harm,

and felony-firearm. The trial court sentenced him to concurrent terms of 15-

to-25 years for the murder conviction, 3-to-10 years for the assault

conviction, and a consecutive 2-years for the firearm conviction.

Petitioner's original habeas application raised two claims: (1)

Petitioner was denied the effective assistance of counsel at trial, and (2)

the misconduct of the prosecutor violated Petitioner's right to a fair trial.

The case was stayed while Petitioner exhausted his state court remedies

with respect to a third claim: (3) Petitioner's appellate counsel was ineffective for failing to raise a claim challenging his sentence under *Alleyne v. United States*, 570 U.S. 99 (2013).

The Court will grant the petition on Petitioner's third claim, conditioning the writ on the sentencing court conducting sentencing proceedings consistent with this opinion and the Constitution. The Court will deny habeas relief with respect to Petitioner's other claims.

## I. Background

The Michigan Court of Appeals summarized the facts surrounding Petitioner's conviction:

> Seals's conviction arises from an altercation that occurred at Cheetah's Lounge on April 7, 2011. Todd Costello testified that he and the victim, Christopher Rice, were friends and members of the Liberty Riders Motorcycle Club. According to Costello, he and his girlfriend went to Cheetah's sometime after 5:30 p.m. While at Cheetah's, Cecil Dunlap, a bouncer who is black, approached Costello and told him that his conduct with his girlfriend was against the establishment's rules. Dunlap told Costello to leave.

> Daniel Abraham, a valet at Cheetah's, testified that he witnessed Costello get thrown out of the building around 7:00 p.m. According to Abraham, Costello started making threats to Dunlap, used racial slurs, and said that he was going to "come back and get you[.]" Costello got into a car with a group and left his car at Cheetah's. Jason Stafford, another Cheetah's employee, testified that he heard Costello yell that he would "be back up here[.]"

Costello testified that he left Cheetah's and went to the Liberty Club's club house. Some point after 11:00 p.m., he and members of the Liberty Club returned to Cheetah's. Costello testified that he intended to retrieve his car. Abraham testified that Costello returned to Cheetah's with 20 to 30 men, and he heard three or four gunshots shortly thereafter.

According to Costello, immediately on entering Cheetah's, Costello approached Dunlap and hit him in the mouth. Others became involved in the fight, including Seals, a white bouncer. Dunlap fell to the ground during the fight, drew gun, and started shooting. Dunlap shot Costello in the hip, and Costello, Rice, and others ran out of the building. Costello testified that Seals chased Rice and continued to strike Rice in the back of the head with a blackjack.

According to Costello, he and Rice entered Rice's Tahoe. While Costello was in the Tahoe, bullets came from behind the vehicle and he was shot in the shoulder. Costello testified that it was Seals, not Dunlap, who was shooting at the Tahoe. Costello admitted that as soon as he saw the vehicle's rear window break, he ducked down between the seats. However, Costello testified that he was "a hundred and ten percent sure" that it was Seals who was shooting at the Tahoe. Rice was also shot and told Costello that he was dying. Rice stopped the Tahoe and moved to a rear seat, and Elliott drove the Tahoe to the hospital. Rice was pronounced dead from a gunshot wound to his back.

Abraham testified that he was 15 to 20 feet away from Seals when he heard gunshots. According to Abraham, he did not see anything in Seals's hands, but Abraham saw flashes on both sides of him. Stafford also testified that he did not see Seals with a gun in his hands. According to Stafford, the gunshots fired outside the building were fired from near the street and came from a red truck.

Jason Gartin testified that he was good friends with Rice and Costello. Gartin's testimony was similar to Costello's, but Gartin testified that Dunlap started the fight by swinging at Costello. According to Gartin, someone fired shots in the air

during the fight, and everyone started to run outside. Gartin testified that he did not see Dunlap outside the building. Gartin did see Seals holding a gun out and firing it "in front." Gartin saw Seals firing at the back window of the Tahoe. Gartin testified that he also saw Seals reach for a second gun. Gartin got into a friend's vehicle and left.

The prosecutor played portions of surveillance videos from Cheetah's. Detroit Police Sergeant Ron Gibson testified that one portion of the video showed a person laying two guns on a counter. Sergeant Gibson testified that the person in the video was Seals. According to Gibson, there was no surveillance video that captured the shooting itself because the outside camera's lighting and focus was bad.

Sergeant Samuel Mackie testified that he spoke with Seals while investigating the shooting. According to Sergeant Mackie, Seals admitted that he and Dunlap were the only bouncers working that night, but denied that any shooting took place at Cheetah's or that he or Dunlap ever had a gun. Seals also denied that gunshots were fired inside or outside Cheetah's.

Detroit Police Officer Mary Gross testified that she examined the Tahoe on April 14, 2011. According to Officer Gross, she found five suspected bullet impact points on the back of the vehicle. Two impacts were the rear doors. One bullet had passed through the back seat and driver's seat. Officer Gross concluded that the shooter shot the Tahoe from its right rear side. Officer Gross testified that additional bullets could have shattered the vehicle's windows and passed through the Tahoe without leaving marks.

Matthew Fillmore testified that, in April 2011, he overheard a conversation at a gym between a person he was "pretty sure" was Seals and an unknown man. Fillmore heard Seals say that he was working as a bouncer, something happened, and he ended up shooting and killing someone. Fillmore contacted the police and spoke with a sergeant about what he had heard because he thought it was the right thing to do.

## B. THE TRIAL COURT'S FINDINGS

The trial court found that either Dunlap or Seals had killed Rice. It found that, on the basis of the video, after Dunlap fired his gun, Costello's group "all rushed out the door."

The trial court found that the video showed Seals chasing after and hitting Rice. The trial court found that the prosecutor had proved beyond a reasonable doubt that it was Seals who shot Rice, and it noted that it relied on the testimony of Officer Gross, the video of Seals in the kitchen area with guns, and Fillmore's testimony to reach this conclusion. The trial court also noted that there was no testimony from Costello and Gartin that placed Dunlap outside, but that Gartin and Costello both testified that Seals was outside. The trial court also found that Officer Gross's investigation corroborated Gartin's testimony that he saw Seals firing at the vehicle.

The trial court also noted that the kitchen video showed Seals "nonchalantly taking guns ... from his waist area and so forth and laying them on the counter...." The trial court noted that Seals had denied ever having a gun when Sergeant Mackie questioned him, which showed his consciousness of guilt. The trial court also accepted Fillmore's testimony that he overheard Seals admit to shooting and killing someone.

*People v. Seals*, No. 316474, 2014 WL 6068115, at *1-3 (Mich. Ct. App. Nov. 13, 2014).

Following his conviction and sentence, Petitioner's trial counsel filed a claim of appeal along with a  motion  for  new  trial. The motion claimed that Petitioner was entitled to a new trial based on newly discovered evidence. (Motion for New Trial, ECF No. 14-1, PageID.1601-1623.) The motion was

supported by affidavits of additional witnesses present on the night of the incident who had not testified at trial. (Id., PageID.1624-1633.)

Petitioner filed an addendum to the motion, asserting that the trial court misapprehended the contents of the surveillance videos and photographs and contending that they showed Dunlap following Petitioner outside the bar before the shooting with a gun at his side and then reentering the bar with Petitioner after the shooting. (Id., PageID.1637-1660.) The trial court denied the motion without holding an evidentiary hearing, finding that the proffered newly discovered evidence was insufficient to warrant a new trial. (Opinion Denying Motion for New Trial, ECF No. 12-15, PageID.1297-1300.)

Petitioner retained a second attorney to pursue a direct appeal, and appellate counsel filed a motion to remand in the Court of Appeals. (Motion to Remand, ECF No. 14-1, PageID.1679-1697.) The motion to remand sought to overturn the decision of the trial court to deny the motion for new trial absent an evidentiary hearing, and it asserted a new claim that Petitioner's trial counsel was ineffective for failing to discover and present additional defense witnesses at the time of trial. (Id.)

Besides the materials provided to the trial court with the motion for new trial, the motion to remand also included affidavits related to

prosecution witness Fillmore, the subject matter of Petitioner's current IATC claim: (1) Petitioner stated in an affidavit that he told his trial counsel that he never worked out at the Oak Park gym where Fillmore testified he overheard Petitioner's admission, and that he worked out at a gym in Shelby Township with George Massad (Motion to Remand, ECF No. 14-1, PageID.1734-1735); (2) Esther Tocco stated in her affidavit that she had been the owner of Fillmore's Oak Park gym, that she knew and recognized Fillmore as a member, but Petitioner had not been a member and she did not recognize him as someone who otherwise had used the gym (Id., ECF No. 14-2, PageID.1742); and (3) Gino Santia stated in his affidavit that he was the manager of the Shelby Township gym, that Petitioner was a member who frequently used the gym, and records detailed the many dates he used the facility in April and May of 2011, for the most part with George Massad. (Id., PageID.1745-1747.)

Trial counsel submitted an affidavit attached to the motion to remand stating that he worked with appellate counsel and private investigators subsequent to trial. (Id., PageID.1763-1766.) Trial counsel confirmed that Petitioner told him prior to trial that he never worked out at the Oak Park gym. (Id., PageID.1764-1765.) Trial counsel's affidavit did not discuss what investigatory steps he took with respect to Fillmore prior to trial. (Id.)

The Michigan Court of Appeals denied the motion for remand:

Defendant-appellant has not shown that an evidentiary hearing was necessary for the trial court to rule on his motion for a new trial when the trial court accepted as true the statements in the proposed witnesses' affidavits produced by defendant-appellant in the trial court. Moreover, additional affidavits and evidence produced by defendant-appellant also do not appear to constitute newly discovered evidence or show that defendant-appellant's counsel was ineffective for not locating and presenting that evidence at trial.

(Order, ECF No. 12-15, PageID.1324.)

Petitioner then filed a brief on appeal raising two claims:

I. Defendant should be granted a new trial because the trial judge's findings were based on conclusions, and the testimony of two crucial witnesses, that were contradicted by video evidence; erred in excluding clear and convincing evidence of provocation; and resulted in verdicts against the great weight of evidence.

II. Due process was violated because the prosecutor failed to correct, and argued facts, that were false and contradicted by video evidence, and that were relied on by the trial judge in finding defendant guilty.

The brief on appeal did not raise Petitioner's IATC claim or a

sentencing claim. (Brief on Appeal, ECF No. 14-2, PageID.1772-1813.) The

Michigan Court of Appeals affirmed Petitioner's conviction in an

unpublished opinion. *Seals*, 2014 WL 6068115.

Petitioner, through the same appellate attorney, then filed an application for leave to appeal in the Michigan Supreme Court. The application raised the same two claims, as well as a third claim:

> III. Defendant is entitled to a remand regarding ineffective assistance of counsel because defense counsel failed to investigate and obtain testimony and records that would have impeached the testimony of a witness found by the trial judge to be unimpeached, and very significant, in his findings and verdicts.

(Application for Leave to Appeal, ECF No. 12-14, PageID.1138.)

The application for leave to appeal significantly narrowed the IATC claim to trial counsel's failure to investigate and impeach prosecution witness Fillmore. (Id, PageID.1139-1143.) The application was denied by standard form order. *People v. Seals*, 865 N.W.2d 21 (Mich. 2015) (Table).

Petitioner returned to the trial court and filed a motion for relief from judgment. Petitioner asserted that his Sixth Amendment rights were violated by application of Michigan's mandatory sentencing guidelines to his case, and that his appellate counsel was ineffective for failing to raise the issue on direct appeal. The trial court granted relief, and it resentenced Petitioner to 7-to-15 years for the murder conviction. (Re-Sentencing Hearing, ECF 12-12, PageID.967-992.)

The prosecutor appealed, and it filed a brief in the Michigan Court of Appeals that raised the following claim:

I. *People v. Lockridge* does not apply to motions for relief for judgment and a defendant is not entitled to be resentenced on that basis. Here, the trial court resentenced defendant based on *People v. Lockridge*, even though defendant's previously imposed sentence was valid. The trial court abused its discretion when it resentenced defendant.

Petitioner then filed the instant case, raising his first two claims and alerting the Court to his possible third claim in light of the prosecution's appeal. The Court stayed the case pending completion of state post-conviction review proceedings. (Order, ECF No. 6.)

The Michigan Court of Appeals reversed the trial court's decision to resentence Petitioner. *People v. Seals*, No. 338850, 2018 WL 6579120, at *1 (Mich. Ct. App. Dec. 13, 2018). Petitioner filed an application for leave to appeal in the Michigan Supreme Court, but it was denied by form order. *People v. Seals*, 925 N.W.2d 873 (Mich. 2019) (Table).

Petitioner thereafter filed a supplemental petition for writ of habeas corpus, raising his IAAC claim. (Supplemental Petition, ECF No. 8.) The case is now ready for decision.

## II. Standard of Review

28 U.S.C. § 2254(d) limits federal habeas review of constitutional claims that were adjudicated on the merits by the state courts. A habeas petitioner must demonstrate that the state court adjudication was "contrary to" or "involved an unreasonable application of" clearly established

Supreme Court law. *Id*. A decision is "contrary to" clearly established Supreme Court law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.

Under this standard, a federal habeas court may not "issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Further, review under § 2254(d) is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

This standard applies to state court orders summarily denying relief on the merits. *See Richter*, 562 U.S. at 98. In such circumstances, a

habeas petitioner satisfies the "unreasonable application" prong only by showing that "there was no reasonable basis" for the state court decision. *Id*. This requires a habeas court to determine what arguments or theories could have supported the state court's decision, and then ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *Id*. at 102.

Finally, a state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. *Id*.

### III. Analysis

A. Ineffective Assistance of Trial Counsel (IATC)

Petitioner's first claim asserts that his trial counsel was ineffective for failing to present evidence challenging Fillmore's testimony that while he was at a Royal Oak gym, he overheard Petitioner admit to shooting someone in a car outside of a bar while working as a bouncer. Petitioner characterizes the missed evidence, consisting of Tocco and Santia's affidavits and the records from the Shelby Township gym, as "analogous to an alibi." (EFC No. 1, PageID.23.) Respondent asserts that habeas relief is

barred under § 2254(d) because the claim was reasonably adjudicated on the merits by the state courts.

1. § 2254(d) Applies

The parties disagree on the standard of review. Petitioner asserts that review is de novo because the state court failed to hold an evidentiary hearing on the claim despite an adequate evidentiary proffer. Respondent asserts that § 2254(d) applies because the Michigan Court of Appeals rejected the claim on the merits when it denied Petitioner's motion to remand.

Petitioner first raised his IATC claim in the motion to remand filed in the Michigan Court of Appeals. That pleading contained allegations of IATC broader than those presented here, and it also sought a hearing on Petitioner's free-standing claim of entitlement to a new trial based on newly discovered evidence. The state court denied the request for a remand, stating in conclusory terms with respect to the IATC claim that the "additional affidavits and evidence produced by defendant-appellant also do not appear to constitute newly discovered evidence or show that defendant-appellant's counsel was ineffective for not locating and presenting that evidence at trial." (Order, ECF No. 12-15, PageID.1324.) Petitioner then omitted the claim from his appellate brief in the Michigan

Court of Appeals, but he included the part of it relating to witness Fillmore in his appeal to the Michigan Supreme Court. (Application for Leave to Appeal, ECF No. 12-14, PageID.1138.) That appeal was denied by standard form order. *Seals*, 865 N.W.2d 21.

Petitioner relies on two cases to support this contention that his IATC claim is subject to de novo review: *Hall v. Quarterman*, 534 F.3d 365 (5th Cir. 2008), and *Robinson v. Howes*, 663 F.3d 819 (6th Cir. 2011).

In *Hall*, the United States Supreme Court had remanded the underlying criminal case to the Texas appellate court for reconsideration of Hall's claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), to determine whether he was ineligible for the death penalty due to mental retardation. On remand, the state court determined that Hall was not mentally retarded without holding an evidentiary hearing. Hall then pursued federal habeas relief, and the Fifth Circuit held that the district court erred by relying on the state court's determination of no mental retardation when no evidentiary hearing had been conducted. The Fifth Circuit found "[t]he facts before us are a core manifestation of a case where the state failed to provide a full and fair hearing and where such a hearing would bring out facts which, if proven true, support habeas relief [under *Adkins*]." *Hall*, 534 F.3d at 369.

*Hall* does not stand for the proposition that evidentiary hearings are a prerequisite for an adjudication on the merits of an IATC claim arising on direct appeal in a non-capital case. Though *Atkins* largely left it to the States to determine the conditions under which an evidentiary hearing is required to determine whether mental retardation disqualifies a defendant for capital punishment, there are circumstances where an evidentiary hearing is constitutionally required. *See Brumfield v. Cain*, 576 U.S. 305 (2015); *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007) ("The lesson we draw from [*Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)] is that, where a petitioner has made a prima facie showing of retardation . . . the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due.") In contrast, the Supreme Court has never held that a defendant in a non-capital case is entitled to an evidentiary hearing on an IATC claim.

Nor does *Robinson* support Petitioner's position. In that case, the state court denied an evidentiary hearing on an IATC claim, and then one was held in the district court on federal habeas review. Significantly, however, the respondent in that case did not oppose the request for a hearing in federal court. The Sixth Circuit found the concession dispositive: "[t]he State did not dispute Petitioner's request for a hearing in the district

court and has not contended on appeal that the district court's grant was improper, claiming only that in light of *Pinholster*, any new evidence elicited at the evidentiary hearing may not support a grant of habeas relief. As we are proceeding under the assumption that § 2254(d)—and thus *Pinholster*—does not apply, we may properly consider the evidence as long as the district court did not abuse its discretion in granting a hearing." 663 F.3d at 824. *Robinson* says nothing about whether § 2254(d) would have applied absent the concession.

Contrary to the cases cited by Petitioner, in *Nali v. Phillips*, 681 F.3d 837, 852 (6th Cir. 2012), the Sixth Circuit considered an IATC claim coming before it in a strikingly similar posture to Petitioner's claim. The petitioner in *Nali* raised his IATC claim in a motion to remand in the Michigan Court of Appeals, as here seeking a hearing to expand the record. The state court denied the motion in a form order. The Sixth Circuit nevertheless found that the order counted as an adjudication on the merits of the IATC claim sufficient to limit review of the claim under § 2254(d).

Shortly after *Nali* was decided, the Sixth Circuit again found that a state court adjudication of an IATC claim without an evidentiary hearing nevertheless qualified as a merits adjudication subject to review under §2254(d). *See Ballinger v. Prelesnik*, 709 F.3d 558, 562 (6th Cir. 2013)

("While allowing a petitioner to supplement an otherwise sparse trial court record may be appealing, especially where he diligently sought to do so in state court, the plain language of *Pinholster* and *Harrington* precludes it.").

*Nali* and *Ballinger* control. The denial of the motion to remand by the Michigan Court of Appeals constituted an adjudication on the merits of Petitioner's IATC claim. Furthermore, because the brief order issued by the Court of Appeals constitutes a summary denials on the merits, the question before the Court is whether—in view of the record before the state court including the evidentiary proffer made by Petitioner—the rejection of Petitioner's claim can be supported by a reasonable basis. *Richter*, 562 U.S. at 98. This requires the Court to determine what arguments or theories could have supported the state court decision, and then determine whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with established Supreme Court law. *Id*. at 102.

2. The *Strickland* Standard

*Strickland v. Washington*, 466 U.S. 668 (1984), sets the familiar two-pronged clearly established Supreme Court standard governing Petitioner's IATC claim. The first prong requires Petitioner to show that his counsel's performance was deficient. The second prong requires Petitioner to show that the deficient performance prejudiced the defense. *Id*. at 687. "Whether

counsel's performance was 'deficient' under the first prong is determined by reference to 'an objective standard of reasonableness' - specifically, 'reasonableness under prevailing professional norms.'" *Hendrix v. Palmer*, 893 F.3d 906, 921 (6th Cir. 2018) (quoting *Strickland*, 466 U.S. at 688). The second prong of the test requires that the defendant affirmatively prove prejudice, meaning that his counsel's errors "must have 'actually had an adverse effect on [his] defense.'" *Id*. (quoting *Strickland*, 466 U.S. at 693).

The two layers of deference combine to create an especially difficult standard for habeas petitioners to meet. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). For a state court's adjudication of a *Strickland* claim to be "unreasonable" under § 2254(d), it "must have been 'so lacking in justification' that it amounts to 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Hendrix*, 893 F.3d at 922 (quoting *Richter*, 562 U.S. at 103).

3. The State Court Adjudication was Reasonable

In light of the record presented to the Michigan Court of Appeals, which included the affidavits and records submitted by Petitioner, its determination that Petitioner failed to demonstrate that he was denied the effective assistance of counsel was reasonable. There are  reasonable bases on which the state court might have denied the claim such that

fairminded jurists could disagree whether they are inconsistent with the *Strickland* standard.

First, with respect to deficient performance, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material." *Hutchison v. Bell*, 303 F.3d 720, 748-49 (6th Cir. 2002) (citing *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997); *Martin v. Mitchell*, 280 F.3d 594, 608 (6th Cir. 2002)).

This is the relatively rare case in which trial counsel submitted an affidavit regarding the subject matter of his alleged ineffectiveness. (App'x I, Motion to Remand; ECF No. 14-2, PageID.1763-1766.)  Defense counsel indicated that he worked with Petitioner's appellate counsel on the motion for new trial. They hired two private investigation agencies to assist them, one of which trial counsel had used to investigate the charges prior to trial. (*Id.*, PageID.1763.) The attorneys directed the agencies to broadly investigate the incident and the witnesses. (*Id.*, PageID.1763-1764.) Prior to trial, investigators had difficulty finding witnesses to the incident willing to

come forward because it involved a motorcycle club and because ownership and patronage of the bar had changed. (*Id*., PageID.1764.) In the end, investigators were able to identify only four former employees and no customers who were willing to come forward at the time of trial. (*Id*.)

It is apparent and unsurprising that trial counsel's chief pretrial investigative efforts were spent developing eyewitnesses to the incident. The start of the incident occurred in a crowded bar, and the shooting outside happened in front of scores of people fleeing the scene. Because it proved difficult to get the eyewitnesses to cooperate, it makes sense too that counsel's investigative efforts—the ones most important to mounting an effective defense—might have come at the expense of more speculative areas. Eyewitnesses are the ones most likely to have material information relevant to the prosecution and defense. Whereas with respect to subject matter of Fillmore's testimony, it is one thing for Petitioner to tell his counsel that he never visited  Fillmore's gym, but it is quite another for counsel to spend scarce investigative resources trying to prove that negative.

In any event, after trial was over, trial counsel indicated that "individuals began to contact others" and they "came forward with information." (*Id*.) That allegation is rather vague, but whatever it means, it led trial and appellate counsel to decide to renew the investigation.

Investigators then obtained "information and affidavits from individuals whom investigators were previously unable to identify or contact." (*Id*.) One of those individuals was Joseph Barringer. (*Id*.) In his affidavit, Barringer stated that he overheard Costello talking with another motorcycle club member at a bar and say that he had been able to get a prosecutor to "vouch" for him in exchange for drugs. (ECF 14-1, PageID.1727.)

Trial counsel believed that "[t]he information provided by Mr. Barringer's affidavit related in part to Matthew Fillmore," who was a prosecutor. In other words, Barringer's statement about an event occurring after trial is the thing that led counsel to suspect that a further investigation into Fillmore's claim was something worth pursuing. (ECF No. 14-2, PageID.1764-1765.) And then after further investigation into the two gyms, counsel was able to procure the affidavits from Esther Tocco and Gino Santia and the records from Petitioner's Shelby Township gym. (*Id*., PageID.1766.)

A fairminded argument can be made that neither the information in trial counsel's affidavit nor the record of his performance at trial suggest that he conducted an inadequate investigation. His cross-examination of prosecution witnesses and his presentation of defense witnesses both suggest that he was very familiar with the facts of the case, he knew what

the statements and claims of the various witnesses had been, and he had reasonably and competently investigated and developed Petitioner's defense in light of the expected testimony. Trial counsel's affidavit indicates that he hired a private investigative firm to assist in his preparation, but that because a motorcycle club was involved in the incident it was difficult to persuade witnesses to cooperate with the investigation. Nevertheless, the investigation uncovered the four employee/contractors of the bar who testified in Petitioner's defense: Massad, Abraham, Stafford, and Billups.

Before trial, counsel certainly knew that Petitioner claimed to have never been to Fillmore's gym. But other than Petitioner's own testimony, it is difficult to imagine how further investigation would lead to convincing evidence that Fillmore did not encounter Petitioner. Fillmore's testimony was vague as to the timing of the encounter. He was "pretty sure" it was a Saturday, either in April or more generally in the Spring of 2011. (ECF No. 12-4, PageID.548, 557-558.) After the encounter, Fillmore searched the internet for a bar shooting matching the description within "a week or two," spoke with Mackie "about a week after that," (*Id*.), but did not make a statement to police until about a year later. (*Id*., at PageID.556). In other words, to undermine Fillmore's expected testimony, absent Petitioner's own testimony, counsel would have had to believe that an investigation could

lead to evidence that accounted for Petitioner's whereabouts for the entirety of several months. Once Petitioner decided not to testify in his own defense, it is difficult to image how counsel could hope to prove where Petitioner had *not* been during the vague timespan testified to by Fillmore.

This is not a case where defense counsel completely ignored an important prosecution witness. Instead of spending valuable preparation time on a likely fruitless effort, trial counsel chose instead to attack Fillmore on more readily available grounds. Fillmore did not remember the date of the encounter. He waited weeks to contact police. The police waited a year to take a statement. And after all that, Fillmore was only "pretty sure" it was Petitioner he saw. A reasonable argument could be made that counsel's decision to lean on the inherent weaknesses in Fillmore's testimony was a constitutionally adequately way to respond to this part of the prosecution's case.

In view of this record, it is not beyond fairminded disagreement to find that trial counsel did not perform deficiently for failing to further investigate this aspect of the case by interviewing people associated with the gyms. "[J]ust as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement." *Coe v.*

*Bell*, 161 F.3d 320, 342 (6th Cir. 1998). A fairminded view of the record indicates that trial counsel chose to spend investigative resources and time pursuing the most important aspect of the case – determining which of the many eyewitnesses to the incident he could develop to undermine the prosecutor's theory.

Turning to the prejudice prong, the evidence that counsel uncovered after trial does not demonstrate that the failure of trial counsel to present Tocco, Santia, or the records undermined the reliability of the trial. If anything, the new evidence uncovered by Petitioner demonstrates the relative futility of trying to prove the negative that Petitioner was never at Fillmore's gym in the Spring of 2011. Petitioner himself states that he never worked out at Fillmore's gym, and he told trial counsel so prior to trial. But Petitioner made the decision not to testify in his own defense. (Colloquy; ECF No. 12-4, PageID.691-692.) And he presents no claim that any advice for him not to testify was deficient.

All that Tocco could say in her affidavit is that Petitioner was not a member of the Royal Oak gym and that she did not recognize Petitioner as someone who otherwise used that gym. She claimed only that she "would recognize the majority of former members" and "some of the non-members who used the facilities." (ECF No. 14-2, PageID.1742.) Meanwhile, Fillmore

testified that he worked out at the gym "several times a week" in April of 2011. (ECF No. 12-4, PageID.547.)  Fillmore could not remember and was not sure whether he had ever seen the man who made the statement before at the gym. (Id., PageID.561.)

While Tocco's statement might constitute decent evidence that Petitioner was not a member or regular user of the Royal Oak gym, it does not indicate that Petitioner never used the gym, or that if he had, that Tocco would have had a record or recollection of that fact. Indeed, unlike Petitioner's Shelby Township gym, Tocco did not indicate that she had records purporting to show the date and time every person entered and left the facility. Tocco only said that she would recognize "some" of the non-members who used her gym, and she signed her affidavit nearly three years after Fillmore claims he saw Petitioner. Fillmore, meanwhile, did not testify that Petitioner was someone he regularly saw at Tocco's gym, though he himself worked out there several times a week. The information in Tocco's affidavit therefore is not inconsistent with anything in Fillmore's testimony. It falls within fairminded disagreement to conclude that its absence from trial did not have an adverse effect on the defense.

Turning to Santia's affidavit and the records from the Shelby Township gym, a  reasonable argument can be made that this information

cuts both ways. On the one hand, the fact records show that Petitioner worked out at the Shelby Township gym on 47 out of 61 days in April and May of 2011, and that he worked out there every Saturday after the incident except May 28, 2011, narrows the window when Fillmore might have encountered Petitioner at the Royal Oak gym. (ECF No. 14-2, PageID.1745-1754.) On the other hand, the records show that Petitioner was an impressively regular gym user. Other than two five-day spans in May of 2011, Petitioner went to the gym nearly every day during those two months. And on fourteen of those dates, Petitioner visited the gym multiple times. (Id.)

Does the fact that Petitioner was a frequent user of the Shelby Township gym make it more or less likely that Petitioner visited other gyms as well? Someone who regularly uses one gym might not need or want to visit other gyms. But someone who is in the habit of using a gym every day might be more likely to occasionally find themselves in the position of having to use an alternate gym other than their usual gym. A reasonable argument can be made that Petitioner's regular use of the Shelby Township gym made it more likely and not less likely that Petitioner used other gyms as well in the Spring of 2011.

It did not fall below realm of fairminded disagreement to reject Petitioner's IATC claim based on the trial record and Petitioner's proffered new evidence. The state court adjudication of Petitioner's IATC claim therefore did not involve an unreasonable application of the *Strickland* standard. Habeas relief with respect to this claim is barred under § 2244(d).

## B. Prosecutorial Misconduct

Petitioner's second claim contends that the prosecutor committed misconduct by mischaracterizing the evidence. Specifically, he asserts that the surveillance videos show that the deceased victim was involved in the assault on Dunlap, that Jason Gartin participated in the assault on Petitioner, and that Dunlap went outside the bar with a gun at his hip seconds after Petitioner exited the bar. (Petition; ECF No. 1, PageID.26.) Petitioner asserts that instead of presenting an unedited copy of the tape that showed these things, the prosecutor introduced an edited version that omitted the parts that were favorable to the defense. Petitioner asserts this led the trial court to believe that Dunlap was not outside when the shooting occurred and that Gartin and the deceased victim did not participate in the assault. Petitioner notes that the defense was permitted to submit its own version of the video, but he asserts that defense counsel nevertheless failed to challenge Gartin's testimony that he was not involved in the

assault, and he notes that the trial court had difficulty playing the defense version of the video.

Respondent asserts that review of the claim is procedurally barred by Petitioner's failure to make a contemporaneous objection.

1. The State Court Decision

The Michigan Court of Appeals rejected Petitioner's claim as follows:

A. Standard of Review

The defendant must "timely and specifically" challenge issues of prosecutorial misconduct before the trial court to preserve them. Here, Seals argues on appeal that the prosecutor offered false arguments in closing. However, Seals did not raise this issue before the trial court. Accordingly, it is unpreserved.

We review unpreserved claims of prosecutorial misconduct for plain error affecting the defendant's substantial rights. An error is plain if it is clear or obvious, and the error affected the defendant's substantial rights if it affected the outcome of the lower court proceedings. We must evaluate the prosecutor's comments in context and in light of the defendant's arguments.

B. Legal Standards

A prosecutor can deny a defendant's right to a fair trial by making improper remarks that infringe on a defendant's constitutional rights or by making remarks that "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." A defendant's due process rights are violated when the defendant is convicted on the basis of false evidence. The prosecutor has a duty to correct false evidence.

## C. Applying the Standards

Seals contends that the prosecutor committed misconduct when he argued that Dunlap was not outside during the shooting because the video evidence showed that Dunlap was in fact outside during the incident. We disagree.

Here, the prosecutor argued in closing that

there's two bouncers working at Cheetah's, one is white [Seals], and one African American [Dunlap], and not one witness, your Honor testified that Cecil Dunlap was outside during the incident, during the fatal shooting. And you've seen the video, and in the video it's [Seals] who is seen outside after the gunshots erupt inside. So, we see [Seals], and even [Seals's] witnesses testify that he was outside.

In response, defense counsel argued that

we believe that video also shows Mr.- later on, Mr. Dunlap coming back into that rear exit door, back into that location. So when he argues to you that Mr. Dunlap was never outside at the time the shooting occurred, we beg otherwise in terms of what the video evidence shows you.

The prosecutor then argued in rebuttal:

Not one, not one of the defense witnesses said Cecil Dunlap was outside, not outside. In the video we played for you, he's not outside, he's inside.

Review[ing] the prosecutor's statements in context, we conclude that the prosecutor did not offer an argument based on false evidence. As discussed above, after our review of the video, it appears that the videos provide evidence that Dunlap was outside after the shooting occurred, not during it. Further, even presuming that the video did show Dunlap outside during the shooting, Seals has not shown he was prejudiced because,

as stated above, the trial court did not rely solely or even extensively, on the video evidence outside Cheetah's when determining Seals's guilt. Instead, it relied on the video showing Seals inside Cheetah's discarding two guns, evidence of Seals's consciousness of guilt, and the testimonies of Costello, Gartin, and Fillmore. We conclude that Seals has not shown that the prosecutor's argument constituted a clear error affecting his substantial rights.

*Seals*, 2014 WL 6068115, at *5-6 (footnotes omitted).

2. Procedural Default

In denying Petitioner's claim, the Michigan Court of Appeals found that defense counsel did not object to the alleged misconduct of the prosecutor, and therefore review of the claim was limited to whether there was "plain error affecting the defendant's substantial rights." The state court then reviewed the complained-of conduct and found that it did not constitute "clear error affecting his substantial rights." Respondent asserts that review of the claim is procedurally barred because the state court's reliance on the "plain error" standard constitutes an independent and adequate state-law ground for denying relief. (Response, ECF No. 13, PageID.1555-1561.) Petitioner filed a reply brief, but it does not address Respondent's procedural default argument. (Reply, ECF No. 15, PageID.1895-1896.)

The doctrine of procedural default precludes a federal court from reviewing the merits of a state prisoner's claims when the state court

declined to hear the claims due to the prisoner's failure to abide by a state procedural rule. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Stated differently, "[w]hen a state court refuses to consider a habeas claim 'due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.'" *Kissner v. Palmer*, 826 F.3d 898, 904 (6th Cir. 2016) (quoting *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977)). Moreover,

> [a] petitioner may avoid this procedural default only by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case. See *Sykes*, 433 U.S. at 87, 90-91. In order to establish cause, a habeas corpus petitioner must show that "some objective factor external to the defense" prevented the petitioner's compliance with a state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

*Id*.

In this Circuit, "[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met: (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional

claim; and (4) the petitioner has not shown cause and prejudice excusing the default." *Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013) (citing *Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir. 2011)). To determine whether a state procedural rule was applied to bar a habeas claim, courts look "to the last reasoned state court decision disposing of the claim." *Id*. (citing *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc)).

Turning to the first factor, there is a relevant state procedural rule: Michigan's contemporaneous-objection rule, which requires a defendant "to properly preserve an issue for appeal" by "'rais[ing] objections at a time when the trial court has an opportunity to correct the error.'" *People v. Pipes*, 715 N.W.2d 290, 296-97 (Mich. 2006) (quoting *People v. Grant*, 520 N.W.2d 123, 130 (Mich. 1994)). Petitioner violated this rule by failing to object at trial to the alleged misconduct of the prosecutor. It is true that trial counsel argued that the videos showed Dunlap going outside with a gun, and he argued why Gartin was unworthy of belief, but trial counsel did not object or assert that the prosecutor's arguments or conduct denied Petitioner's due process right to a fundamentally fair trial.

With respect to the second factor, the Michigan Court of Appeals was the last state court to issue a reasoned decision on Petitioner's claim, and it reviewed the claim under the "plain error" standard after noting Petitioner's

failure to make a contemporaneous objection. A state appellate court's "plain error" review is considered enforcement of a procedural default. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

Third, the state procedural rule is undoubtedly an adequate and independent state ground for denying review of a federal constitutional claim because it is both well-established and normally enforced. *Taylor v. McKee*, 649 F.3d 446, 450-51 (6th Cir. 2011).

The remaining question is whether Petitioner can demonstrate "cause" for the procedural default and prejudice. The obvious and only candidate for cause—that trial counsel was ineffective for failing to object to the conduct of the prosecutor on constitutional grounds—is unavailable to Petitioner. When a habeas petitioner claims ineffective assistance of counsel as cause for a procedural default, the allegation of ineffectiveness is a separate claim that must itself be exhausted in state court. *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000); *Murray v. Carrier*, 477 U.S. 478, 489 (1986) ("The exhaustion doctrine…generally requires that a claim of ineffective assistance of counsel be presented to state courts before it may be used to establish cause for a procedural default.") According to *Edwards*, the failure to exhaust the ineffectiveness claim will itself constitute a procedural default of the cause argument. 529 U.S. at 452.

Petitioner never exhausted a claim that his trial counsel was ineffective for failing to object to the alleged prosecutorial misconduct, and therefore he cannot use it to demonstrate cause to excuse his default.

Nor can Petitioner demonstrate prejudice. The harm complained of is that the trial court was falsely led to believe that the videos show that Dunlap was not outside the bar when the fatal shooting occurred. The parties on direct appeal expressed substantially different views on what the videos show. (*Compare* Petitioner's Brief on Appeal, ECF No. 14-2, PageID.1792-1793, *with* Prosecutor's Brief on Appeal, ECF No. 14-2, PageID.1873-1874.) Probably as a result of this factual dispute, the Michigan Court of Appeals reviewed the videos for itself and made a factual determination that undermined Petitioner's claim: "[T]he video shows that, while a person matching Dunlap's description is outside Cheetah's, that person does not move toward the area of the building where the shooting occurred until after it appears that the shooting has ended." *Seals*, 2014 WL 6068115, at *4. The Court further stated, "after our review of the video, it appears that the videos provide evidence that Dunlap was outside after the shooting occurred, not during it." *Id.* at *6.

Petitioner continues to insist here that the videos show that Dunlap was outside with a gun in time for the shooting, but this Court is bound by

the factual finding made by the Michigan Court of Appeals when it resolved this explicitly disputed point. "[A] determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This rebuttable presumption extends to factual findings made by a state appellate court reviewing the trial record. *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)). Petitioner has not offered clear and convincing evidence that the factual determination made by the Michigan Court of Appeals was incorrect. He therefore cannot show that he was prejudiced by the prosecutor's characterization of the what the videos show.

With respect to Gartin's allegedly false testimony, the Michigan Court of Appeals did not directly address this allegation. Petitioner asserted in the state courts that Gartin lied on cross-examination on three occasions. (Petitioner's Brief on Appeal, ECF No. 14-2, PageID.1810.) In the first, Gartin described how Dunlap charged Costello immediately when they entered the bar. (ECF No. 12-3, PageID.407.) In the second, Gartin testified that Petitioner came after Rice with a "slapstick." (Id., PageID.414.) And in the third, Gartin denied that he threw any punches during the

ruckus. (Id., PageID.420-421.) Meanwhile, whatever problems Petitioner claims the trial court had in playing the defense version of the video, the trial court's findings indicate that the video it reviewed showed the altercation in the bar that occurred just before the shooting outside. (See ECF No. 12-5, PageID.750-752.) The trial court sitting as trier of fact was well-aware of the extent to which Gartin may have minimized his own involvement in the altercation inside the bar. Petitioner has not shown that he was prejudiced by the prosecutor's failure to correct Gartin's allegedly false testimony.

Apart from demonstrating cause and prejudice, a habeas petitioner may nevertheless pursue a procedurally defaulted claim if he can demonstrate that failure to consider her claim "will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Petitioner has not presented the Court with evidence of actual innocence. A miscarriage of justice will not occur as a result of the Court's failure to address the defaulted claim.

Petitioner's second claim is therefore inexcusably procedurally defaulted.

## C. Ineffective Assistance of Appellate Counsel (IAAC)

Petitioner's third claim asserts that his appellate counsel was ineffective for failing to raise a claim challenging his sentence under *Alleyne v. United States*, 570 U.S. 99 (2013). The IAAC claim was first raised in the state courts in Petitioner's motion for relief from judgment. The trial court granted relief and resentenced Petitioner to 7-to-15 years for his murder conviction. The prosecutor appealed, and the Michigan Court of Appeals reversed:

> [W]e are unpersuaded by Seals's argument concerning "good cause" under MCR 6.508(D). A defendant can establish "good cause" for purposes of that rule "by proving ineffective assistance of appellate counsel, pursuant to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)," *People v. Reed*, 449 Mich. 375, 378 (1995), which is what Seals argues here, contending that his appellate lawyer performed ineffectively by failing to raise a claim of error under *Alleyne*. However, a lawyer is not ineffective for failing to argue a meritless position, *People v. Mack*, 265 Mich. App. 122, 130 (2005), nor is he or she ineffective for failing to raise a novel legal argument that is unsupported by existing law, *People v. Reed*, 453 Mich. 685, 692 (1996). Nearly a year before deciding Seals's first appeal, this Court held that Michigan's sentencing guidelines did not run afoul of *Alleyne*. *People v. Herron*, 303 Mich. App. 392, 405 (2013), rev'd in part 498 Mich. 901 (2015), and overruled by *Lockridge*, 498 Mich. at 399. Accordingly, at the time that Seals's lawyer filed an appellate brief on Seals's behalf, there was binding precedent unequivocally holding that the sentencing guidelines were not unconstitutional under *Alleyne*. Therefore, because

Seals cannot demonstrate that his appellate lawyer performed ineffectively by failing to raise a claim of error that was directly contradicted by binding precedent at the time in question, his sole argument for "good cause" under MCR 6.508(D) fails.

*Seals*, 2018 WL 6579120, at *1.

Respondent asserts that relief is barred under § 2254(d) because this decision did not involve an unreasonable application of the clearly established Supreme Court law.

As indicated above, ineffective assistance of counsel claims are reviewed under the two-pronged *Strickland* test. Claims asserting ineffective assistance of appellate counsel are governed by the same standard. *Webb v. Mitchell*, 586 F.3d 383, 398 (6th Cir. 2009). This requires a defendant to demonstrate: (1) his appellate counsel acted unreasonably in failing to discover and raise nonfrivolous issues on appeal, and (2) there is a reasonable probability he would have prevailed on appeal if his attorney had raised the issues. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687-91, 694).

1. Factual Background and Legal Landscape at Time of Petitioner's Direct Appeal

It is worthwhile to recount the state of the law surrounding Petitioner's underlying sentencing claim at the time of Petitioner's appeal of right.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that a sentencing judge is prohibited from enhancing a sentence beyond the statutory maximum for the offense of conviction based on facts other than those decided by the jury beyond a reasonable doubt. The principle announced in *Apprendi* was further developed in *Blakely v. Washington*, 542 U.S. 296 (2004), and *Booker v. United States*,543 U.S. 220 (2005). In the period following these decisions, defendants in Michigan attempted to challenge the constitutionality of the State's sentencing scheme. The Michigan Supreme Court rejected those arguments. *See People v. Harper*, 739 N.W.2d 523 (Mich. 2007); *People v. Drohan*, 715 N.W.2d 778 (Mich. 2006); *People v. McCuller*, 715 N.W.2d 798 (Mich. 2006). The Sixth Circuit likewise held that Michigan's scheme did not violate the Constitution. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).

When Petitioner was sentenced on May 3, 2013, the above-cited cases held that Michigan's sentencing scheme was constitutional. Respondent does not dispute the allegation that the trial court scored Petitioner's guidelines based on facts that were not determined beyond a reasonable doubt at trial. (See Sentencing Tr., ECF No. 12-6, PageID.801-817.) The trial court further found that it would sentence Petitioner within

the guidelines range because there were not substantial and compelling reasons to depart from them. (Id., PageID.834-835.)

On June 17, 2013, about six weeks after sentencing, the Supreme Court decided *Alleyne*, holding that the *Apprendi* line of cases applied to a sentencing scheme that used judicial fact finding to determine whether a mandatory minimum sentencing provision applied. On December 12, 2013, the Michigan Court of Appeals issued a published decision holding that the rule announced in *Alleyne* did not apply to Michigan's scheme. *People v. Herron*, 845 N.W.2d 533, 539 (Mich. App. 2013).[1]

On February 13, 2014, before appellate counsel filed Petitioner's appellate brief, the Michigan Court of Appeals issued its decision in *People v. Lockridge*, 849 N.W.2d 388 (Mich. App. 2014). The Court, stating that it was bound by *Herron*, rejected the defendant's *Alleyne* challenge to Michigan's scheme. *Id*. 849 N.W.2d at 391. Two judges wrote concurring opinions, however, observing that they disagreed with the result reached in

---

[1] Respondent asserts that the Sixth Circuit also issued opinions at the time agreeing with *Herron* that *Alleyne* did not apply to Michigan's scheme, but the cases it relies on are inapposite. *See Kittka v. Franks*, 539 F. App'x 668, 673 (6th Cir. 2013) ("when the state court considered this case, *Alleyne* had not been decided . . . . Our review therefore is premised entirely on the Supreme Court's pre-*Alleyne* decisions and does not address the effect of *Alleyne* on either Michigan's indeterminate sentencing scheme or mandatory minimum sentences imposed under that scheme."); *Saccoccia v. Farley*, 573 F. App'x 483, 485 (6th Cir. 2014) (application of *Alleyne* to federal guidelines); *United States v. James*, 575 F. App'x 588, 595-96 (6th Cir. 2014) (same).

*Herron* and that they were inclined to rule that Michigan's scheme was unconstitutional under *Alleyne*. *Id.*, 849 N.W.2d at 391-405, 405-408.

This was the state of play when appellate counsel filed Petitioner's appellate brief on April 8, 2014. (ECF No. 14-2, PageID.1814.) And while the brief did not raise a sentencing claim under *Alleyne*, this was no pro forma appeal. Appellate counsel worked together with trial counsel to reopen the investigation, and the attorneys hired two private investigative firms to develop new witnesses. After the trial court denied the motion for a new trial and for an evidentiary hearing, appellate counsel sought an order from the Court of Appeals remanding the case to compel the trial court to hold a hearing on his claim of newly discovered evidence and ineffective assistance of trial counsel. Appellate counsel then filed an appellate brief raising two arguable though ultimately meritless issues.

That said, appellate counsel did not make a strategic decision to omit a sentencing claim in favor of these other issues. Appellate counsel stated in an affidavit filed with the trial court as part of his motion for relief from judgment that he "did not consider any form of issue regarding sentence, was not aware of *People v. Lockridge* and did not relate *Alleyne v. United States* to my client's sentencing." (ECF No. 8-3, PageID.106.)

On June 11, 2014, about two months after appellate counsel filed the appellate brief, the Michigan Supreme Court granted leave to appeal in *Lockridge. Id.,* 847 N.W.2d 925. Then, starting on July 29, 2014, the Michigan Supreme Court began issuing orders holding other direct criminal appeals in abeyance in light of its decision to hear *Lockridge*. (Exhibits 4 and 5(S), Supplemental Petition, ECF No. 8-5, PageID.110-114.) Petitioner's appellate counsel did not seek permission to file a supplemental pleading in the Court of Appeals to raise a claim under *Alleyne*.

On November 13, 2014, the Michigan Court of Appeals affirmed Petitioner's convictions. Appellate counsel filed for leave to appeal in the Michigan Supreme Court on January 7, 2015, but he again did not seek to add a claim under *Alleyne*. Meanwhile, the Michigan Supreme Court had already held 57 cases in abeyance in which *Alleyne* claims were raised. When the Michigan Supreme Court eventually denied leave to appeal in Petitioner's case on June 30, 2015, the Court had held another 46 cases in abeyance. (Exhibit 6(S), Supplemental Petition, ECF No. 8-5, PageID.115-118.) That is, over 100 other defendants facing the same legal backdrop faced by appellate counsel in Petitioner's case managed to raise *Alleyne* claims in those appeals. Meanwhile, Petitioner's appellate counsel states

that he was unaware of *Lockridge* and that he did not relate *Alleyne* to Michigan's scheme.

On July 29, 2015, the Michigan Supreme Court issued its opinion in *Lockridge*, finding that Michigan's mandatory sentencing guidelines scheme violated *Alleyne*. *Lockridge*, 870 N.W.2d at 506.

B. The Court of Appeals Unreasonably Rejected Petitioner's IAAC Claim

In light of this background, the Court finds that the rejection of Petitioner's IAAC claim by the Michigan Court of Appeals resulted in an unreasonable application of clearly established Supreme Court law.

Two cases persuade the Court of this result. First, in *Robinson v. Woods*, 901 F.3d 710 (6th Cir. 2018), the Sixth Circuit encountered a Michigan defendant who was sentenced just after *Alleyne* was decided but whose direct appeal was completed before the Michigan Supreme Court issued *Lockridge*. Applying § 2244(d) deference because the Court of Appeals rejected Petitioner's sentencing claim on the merits, the Sixth Circuit held that the Supreme Court's decision in *Alleyne* "clearly established" that Michigan's sentencing scheme was unconstitutional. 901 F.3d at 714. The court found, "[a]t bottom, Michigan's sentencing regime violated *Alleyne's* prohibition on the use of judge-found facts to increase

mandatory minimum sentences." *Id*. at 716 (citing *Alleyne*, 570 U.S. at 111-12).

Second, in *Chase v. Macauley*, 971 F.3d 582 (6th Cir. 2020), the Sixth Circuit found that a habeas petitioner demonstrated cause and prejudice to excuse his procedural default of failing to raise an *Alleyne* claim on direct review because his appellate counsel was ineffective for failing to raise the claim on direct appeal.[2]

The time frame involved in *Chase* is essentially the same as presented here. Chase's appellate counsel filed his direct appeal brief in the Court of Appeals in March of 2014, and his conviction was affirmed in October of 2014 – both dates are about a month earlier than the dates here. The appellate attorney in *Chase* thus had the same legal landscape available to him that Petitioner's appellate counsel had here to craft arguments that *Alleyne* applied to Michigan's scheme. Both attorneys also had the same opportunities to raise the claim at various points on direct

---

[2] Unlike the present case, the habeas petitioner in *Chase* raised *Alleyne* as his substantive claim for habeas relief, and he raised his IAAC claim as an argument to demonstrate cause and prejudice to excuse the procedural default. Because of this procedural posture, the Sixth Circuit reviewed the IAAC argument de novo. *Id.*, 971 F.3d at 591-592. As indicated by *Chase*, a free-standing IAAC claim is subject to § 2254(d) review whereas an IAAC cause-and-prejudice claim is not. *Id.*, citing *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009); *Smith v. Warden, Toledo Corr. Inst.*, 780 F. App'x 208, 225 (6th Cir. 2019); *Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006) (IAAC claim is reviewed *de novo* if it is being used to excuse procedural default; it is only subject to AEDPA deference when viewed as a freestanding claim for relief).

appeal as the *Lockridge* case gained traction as it wound its way through the state system.

*Chase* rejected the argument that appellate counsel in that case could not be faulted for failing to predict the change in law from *Herron* to the Michigan Supreme Court's decision in *Lockridge*:

> Before Chase's attorney filed his opening appellate brief, judges on the Michigan Court of Appeals panel in *Lockridge* had clearly and forcefully detailed why *Alleyne* rendered Michigan's sentencing scheme unconstitutional. . . . Furthermore, the Michigan Supreme Court granted review in *Lockridge* early on in the pendency of Chase's appeal, before the state even filed its brief. . . . Defendant after defendant continued to raise *Alleyne* challenges despite the existence of *Herron*, recognizing the merit of this claim. And finally, *Robinson* makes clear that *Herron* was contrary to "clearly established" binding U.S. Supreme Court precedent—beyond all possible disagreement among fair-minded jurists. . . . . Given all of these factors, the change in Michigan law was "clearly foreshadowed," and Chase's appellate attorney's failure to raise this claim was constitutionally deficient.

*Id.*, 971 F.3d at 594.

Turning to the present case, if Petitioner had raised his claim directly under *Alleyne* and used his IAAC claim as a cause-and-prejudice argument as in *Chase*, that case would dictate the result. But Petitioner presents his substantive claim for relief as an IAAC claim. And because the Michigan Court of Appeals explicitly rejected that claim on the merits, it is not enough for Petitioner to demonstrate as the petitioner in *Chase* did as matter of de novo review that his appellate counsel was ineffective for failing to raise an

*Alleyne* claim. Rather, Petitioner must show that the state court's determination that counsel was not ineffective was unreasonable. *Joseph*, 469 F.3d at 459.

Petitioner meets that difficult burden. The only rationale relied on by the Michigan Court of Appeals for denying Petitioner relief is *Herron's* existence as creating sufficient justification for appellate counsel's failure to raise an *Alleyne* claim. The Court of Appeals found that *Herron* constituted "binding precedent unequivocally holding that the sentencing guidelines were not unconstitutional under *Alleyne*." *Seals*, 2018 WL 6579120, at *1. That rationale cannot be squared, however, with what the Sixth Circuit stated in *Robinson*. In *Robinson*, the Sixth Circuit held that *Alleyne* itself "clearly established" that Michigan's scheme violated the Sixth Amendment. Obviously, the Michigan Court of Appeals in *Herron* could not overrule the United States Supreme Court on a point of federal constitutional law.

Petitioner's claim is that his appellate counsel performed deficiently by failing to recognize a winning sentencing claim whose result was already clearly dictated by existing United States Supreme Court precedent – despite what the Michigan Court of Appeals erroneously said in *Herron*. This is not a case where appellate counsel is alleged to have failed to

predict a change in the law. Rather, *Robinson* says that *Alleyne* had already "clearly established" that the Michigan scheme was unconstitutional. That is, the Michigan Court of Appeals unreasonably and inaccurately characterized the situation when it described Petitioner's sentencing claim at the time of his direct appeal as "a meritless position," requiring "a novel legal argument that [was] unsupported by existing law," and there being "binding precedent unequivocally holding that the sentencing guidelines were not unconstitutional under *Alleyne*." *Seals*, 2018 WL 6579120, at *1. To the contrary, and as *Robinson* found, the argument required no novelty: *Alleyne* had already clearly established the constitutional rule entitling Petitioner to sentencing relief. It was objectively unreasonable for the Michigan Court of Appeals to find that appellate counsel could reasonably ignore a claim whose merit was clearly established by United States Court precedent just because a published state court decision erroneously held otherwise.

Turning to prejudice, because the Michigan Court of Appeals did not address this prong, review is de novo. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Stickland* analysis.") To establish prejudice, Petitioner must

show "that had appellate counsel raised the [*Alleyne*] issue on appeal, there is a reasonable probability that [Petitioner] would have received a new sentencing proceeding." *Evans v. Hudson*, 575 F.3d 560, 565 n.1 (6th Cir. 2009).

As explained in *Chase*, after the Michigan Supreme Court issued *Lockridge*, it "reversed the Court of Appeals' judgments in a slew of cases where the intermediate appellate court had erroneously rejected defendants' *Alleyne* claims under the now-overruled *Herron* decision, remanding to the defendants' respective sentencing courts." *Chase*, 971 F.3d at 589. Respondent does not contest the allegation that had appellate counsel presented an *Alleyne* claim like the defendants in those many other cases, he too would have obtained sentencing relief. And as Petitioner states, there is no need to guess here – the trial court actually imposed a significantly lower sentence when it granted Petitioner's motion for relief from judgment. Petitioner has therefore demonstrated that he was prejudiced by his appellate counsel's failure to raise an *Alleyne* claim on direct appeal.

Petitioner has therefore demonstrated entitlement to habeas relief with respect to his third claim. The state court unreasonably rejected the claim that appellate counsel was ineffective for failing to raise an *Alleyne*

claim on direct appeal contrary to § 2254(d). The Court will therefore conditionally grant the petition for a writ of habeas corpus. Respondent is ordered to release Petitioner from his unconstitutional judgment of sentence unless the sentencing court conducts a new sentencing proceeding within 180 days that is consistent with this opinion and the Constitution. *See Chase*, 971 F.3d at 596; *Robinson*, 901 F.3d at 718.

## IV. Certificate of Appealability

If Petitioner seeks to appeal the Court's decision with respect to his first and second claims, he must first obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2). An applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002). Here, the Court finds that jurists of reason could debate the Court's conclusion that Petitioner failed to demonstrate entitlement to habeas relief with respect to his IATC claim but not with respect to his prosecutorial misconduct claim. Therefore,

a certificate of appealability will be granted only with respect to Petitioner's first claim.

## V. Conclusion

Accordingly, the Court **GRANTS** in part the petition for a writ of habeas corpus based on his third claim. Respondent is ordered to release Petitioner from his unconstitutional judgment of sentence unless the sentencing court conducts a new sentencing proceeding within 180 days consistent with this opinion and the Constitution.

The petition for writ of habeas corpus is **DENIED** with respect to Petitioner's first and second claims.

Finally, the Court **GRANTS** a certificate of appealability with respect to Petitioner's first claim and **DENIES** a certificate of appealability with respect to Petitioner's second claim.

**SO ORDERED.**

Dated: May 25, 2021                    s/George Caram Steeh
                                       UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 25, 2021, by electronic and/or ordinary mail.

s/Leanne Hosking
Deputy Clerk